1   TODD M. SCHNEIDER (SBN 158253)
    JASON H. KIM (SBN 220279)
2   SCHNEIDER WALLACE
    COTTRELL KONECKY LLP
3   180 Montgomery Street, Suite 2000
    San Francisco, California 94104
4   Tel: (415) 421-7100
    Fax: (415) 421-7105
5   tschneider@schneiderwallace.com
    jkim@schneiderwallace.com
6
    JOSEPH C. PEIFFER (*pro hac vice* to be submitted)
7   DANIEL J. CARR (*pro hac vice* to be submitted)
    FISHMAN HAYGOOD PHELPS WALMSLEY
8   WILLIS & SWANSON, LLP
9   201 St. Charles Avenue, 46th Floor
    New Orleans, Louisiana 70170
10  Tel: (504) 586-5252
    Fax: (504) 586-5250
11  jpeiffer@fishmanhaygood.com
    dcarr@fishmanhaygood.com
12
    Attorneys for Plaintiff
13  [Additional counsel on signature page]

14

15                     UNITED STATES DISTRICT COURT
                       CENTRAL DISTRICT OF CALIFORNIA
16                            SOUTHERN DIVISION

17  CAROL PROCK, as Trustee of the Carol J.      CASE NO.:
18  Prock Revocable 1998 Trust, and On Behalf of
    All Others Similarly Situated,                   SACV 13 - 00942 JST (ANx)
19
                        Plaintiff,
20
                        v.
21
22  THOMPSON NATIONAL  PROPERTIES,          CLASS ACTION COMPLAINT AND
    LLC, TNP COMMERCIAL SERVICES,            DEMAND FOR A JURY TRIAL
23  LLC, TNP 6700 SANTA MONICA
    BOULEVARD, DST, ANTHONY W.
24  THOMPSON, JACK R. MAURER, GREG
    GENOVESE, NEIL MILLER, DARRELL
25  BETTS, JOHNNA HOWARD, STEPHEN
    COREA, DARRYL GOODMAN, MARK
26  OSGOOD,  LYLE LANSDELL, AND TNP
    DOE ENTITIES 1-10,
27
                        Defendants.
28

Plaintiff Carol Prock, as Trustee of the Carol J. Prock Revocable 1998 Trust, and on behalf of all others similarly situated, by and through her attorneys, files this class action complaint against defendants Thompson National Properties, LLC, TNP Commercial Services, LLC, TNP 6700 Santa Monica Boulevard, DST, Anthony W. Thompson, Jack R. Maurer, Greg Genovese, Neil Miller, Darrell Betts, Johnna Howard, Stephen Corea, Darryl Goodman, Mark Osgood, and Lyle Lansdell (collectively, "Defendants") and alleges, upon investigation by counsel and belief, as follows:

## INTRODUCTION

1.     This class action arises from Plaintiff and the class members' investments in Defendant TNP 6700 Santa Monica Boulevard, DST ("TNP Kodak"), an investment trust sponsored, promoted, sold, and managed by Thompson National Properties, LLC ("TNP") and the other Defendants.

2.     TNP Kodak was formed to offer investors the opportunity to participate in the acquisition of a property located in Los Angeles, California (the "Property"), lease the Property to the Eastman Kodak Company ("Kodak"), and distribute the rent received from Kodak, minus certain payments and expenses, to the TNP Kodak investors.

3.     The viability of TNP Kodak depended on: (1) the ability of Kodak to continue to make its substantial rent payments for the Property for the five year term of the lease; (2) TNP management's skill and integrity; and (3) TNP's own viability.

4.     Defendants, however, made numerous misrepresentations to the investors in TNP Kodak and failed to disclose to them material information about those three critical factors and, by doing so, fraudulently induced Plaintiff and the class members to entrust millions of dollars to TNP.

5.     When Kodak filed for bankruptcy in 2012 and subsequently rejected its lease on the Property, Defendants caused TNP Kodak to sell the Property at a substantial loss.  This caused Plaintiff and the class members to lose most of their investment.

6.     Indeed, Defendants' misrepresentations, mismanagement, misappropriation of investor funds, and other misconduct with respect to TNP Kodak was their *modus operandi* in

several other TNP–sponsored real estate investment programs, a fact that was not disclosed to Plaintiff and the class members.

7.     In or about February 2008, Defendant Anthony Thompson ("Thompson") formed TNP.  TNP purported to acquire and manage real estate properties, directly or through a number of investment vehicles.

8.     Starting in or about March, 2008, TNP organized a number of investment vehicles whose purpose was to raise funds from investors for real estate projects and/or transactions.

9.     The offering materials for such offerings included material misrepresentations and omissions, of which Defendants were aware.

10.     Defendants commingled funds raised in various offerings and made Ponzi–like distribution payments to investors.

11.     In December, 2008, TNP commenced a private placement offering investments in TNP Kodak.

12.     TNP was TNP Kodak's sponsor and, directly and/or through fully–controlled entities, its manager.

13.     TNP and the other Defendants prepared, oversaw, and/or directed the preparation of, a set of documents which they circulated to prospective investors to solicit investments in TNP Kodak.

14.     The TNP Kodak offering documents contained numerous misrepresentations and omissions of material facts.  Specifically, they:

  a.     Misrepresented to investors the financial condition of TNP and omitted to disclose that TNP's finances were rapidly deteriorating;

  b.     Omitted to disclose that two TNP entities had defaulted on their financial obligations;

  c.     Omitted to disclose the magnitude of TNP's losses and its negative net equity;

d.     Omitted to disclose that TNP was concurrently promoting several other real estate investment programs through material misrepresentations and omissions;

e.     Omitted to disclose that TNP and its affiliates were dependent on continuously raising new capital to meet their existing financial obligations;

f.     Omitted to disclose that TNP was commingling investor money and using investor money to make distribution payments to other investors in Ponzi–scheme fashion;

g.     Misrepresented the use of proceeds to be raised from TNP Kodak investors and omitted to disclose TNP's misappropriation of funds that belonged to TNP Kodak investors; and

h.     Misrepresented Kodak's financial condition and prospects, and omitted to disclose information about Kodak's rapidly-deteriorating financial condition and the threats posed to the continued viability of the Entertainment Imaging line of business for which Kodak leased the Property.

15.   Defendants had knowledge of such misrepresentations and omissions.

16.   Through the use of the TNP Kodak offering documents, TNP and the other Defendants raised $16,570,000 from Plaintiff and the class members.

17.   In January 19, 2012, Kodak filed for bankruptcy.  In February, 2013 Kodak stopped making rent payments to TNP Kodak and vacated the Property.

18.   TNP Kodak's cash reserves were insufficient to allow TNP Kodak to continue to service its mortgage loan for the Property while searching for new tenants or a buyer willing to pay a fair price for the Property.

19.   To avoid foreclosure (which would have triggered Defendant Thompson's personal guarantee to the lender), in May 2013, TNP Kodak sold the Property to the lender at a $6.4 million loss from it purchase price.  Most of the sales proceeds were used to pay off the mortgage on the Property.  Subsequently, Defendants commenced the liquidation of TNP Kodak and returned to its investors approximately 37% of their initial investment.

20.     On June 11, 2013, the Financial Industry Regulatory Authority ("FINRA") entered an Order Accepting Offer of Settlement, (the "Order") where it sanctioned a former senior officer of two TNP affiliates, who had been involved in promoting TNP–sponsored real estate investment programs, for, *inter alia*, failing to adequately investigate such TNP offerings prior to promoting them to investors.  The Order is attached to this Complaint as Exhibit A.

21.     In its Order, FINRA noted multiple violations of securities rules and regulations by TNP in connection with several of its offerings, including material misrepresentations, omissions, commingling of funds among various programs, and Ponzi–like payments of distributions to investors with other investors' money.

22.     Plaintiff and the class members were investors in TNP Kodak and bring this action to recover losses and damages suffered as the result of Defendants' material misrepresentations and/or omissions in the marketing and sale of TNP Kodak securities, misappropriation of investor funds, and other misconduct as set forth below.

## PARTIES

23.     Plaintiff, Carol Prock, is a citizen of California.  She is retired and resides in Sacramento, California.  She invested in TNP Kodak through the Carol J. Prock Revocable 1998 Trust, of which she is the Trustee.

24.     Defendant Thompson National Properties, LLC is a limited liability company registered in Delaware, and with its principal place of business located at 1900 Main Street, Suite 700, Irvine, CA 92614.

25.     Defendant TNP Commercial Services, LLC is a limited liability company registered in Delaware, and with its principal place of business located at 1900 Main Street, Suite 700, Irvine, CA 92614.  TNP Commercial Services, LLC was identified as the "Signatory Trustee" for TNP Kodak pursuant to Delaware law and is an affiliate of Thompson National Properties, LLC.

26.     Defendant TNP 6700 Santa Monica Boulevard, DST is a Delaware Statutory Trust, with its principal place of business located at 1900 Main Street, Suite 700, Irvine, CA 92614.  TNP 6700 Santa Monica Boulevard, DST was nominally the issuer of the securities at issue in this action.

27. Defendant Anthony W. Thompson is a citizen of California, with his principal residence in Orange County. He is the founder, principal, control person, and Managing Member of TNP. From TNP's inception to June 2012, Thompson acted as its Chief Executive Officer.

28. Defendants Jack R. Maurer, Greg Genovese, Neil Miller, Darrell Betts, Johnna Howard, Stephen Corea, Darryl Goodman, Mark Osgood, and Lyle Lansdell (the "TNP Officer Defendants") were TNP's Executive Officers and/or control persons at all relevant times.

29. Because of their positions of control and authority as senior officers, executives, and/or principals of TNP, the TNP Officer Defendants were able to and did control TNP's activities, including its preparation and dissemination of misleading offering documents for the TNP offerings such as TNP Kodak and others, and its management of the TNP–sponsored programs such as TNP Kodak and others.

30. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes and transactions that are the subject of this lawsuit. Defendants, and each of them, have participated in the improper acts or acted with or in furtherance of them, or aided or assisted in carrying out their purposes as alleged in this Complaint, and have performed acts and made statements in furtherance of the violations.

31. Defendants TNP Doe Entities 1-10 are corporations, partnerships, limited liability companies, investment trusts, and other forms of legal entities affiliated with TNP that were used to facilitate the misconduct set forth below. Although the names of some such entities are known (such as TNP Property Manager, LLC and TNP 6700 Santa Monica Boulevard LeaseCo LLC), their precise role is not yet known and such entities will be named based upon further discovery if necessary to secure complete relief for Plaintiff and the Class.

## JURISDICTION AND VENUE

32. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d), as the aggregate amount in controversy exceeds $5,000,000, at least one class member is a citizen of a State different from a defendant, and more than one third of all Class members may reside outside of the State of California. According to filings with the Securities and Exchange Commission, Defendants solicited potential investors in TNP Kodak located in several states.

33.     Venue is proper under 28 U.S.C. §§ 1391 because a substantial part of the events or omissions giving rise to the claims alleged below occurred in this District and because the Property is located in this District.  Venue is also proper because all Defendants transact or have transacted business in this District at times material to this action.

## FACTUAL ALLEGATIONS

**I.      Thompson Forms TNP.**

34.     In or about February 2008, Defendant Thompson formed Thompson National Properties, LLC, a Delaware limited liability company.  TNP was formed for the purpose of investing in the real estate market directly and through real estate investment programs it sponsored.

35.     To accomplish its purpose, TNP, directly and through wholly owned and/or controlled affiliates, purported to, *inter alia,* engage in real estate transactions, organize real estate programs, promote such programs, and/or conduct private or public offerings to recruit investors in such programs, manage real estate properties it owned, and manage real estate programs it organized.

36.     The real estate programs sponsored by TNP were designed to be wholly dependent upon TNP to successfully operate.  The programs relied upon TNP and/or its wholly owned and/or controlled affiliates to invest their investors' money, identify real estate investment opportunities, obtain financing, manage real estate assets, engage in other real estate transactions, and otherwise conduct and oversee the programs' business functions including accounting and bookkeeping, human resources, and collection and disbursement of funds.

37.     Thus, TNP's viability, financial resources, and ability to conduct such activities for the programs it sponsored were crucial to the success of such programs.

**II.     TNP Organizes and Promotes Real Estate Investment Programs.**

38.     Starting in March, 2008, TNP organized and promoted a number of real estate investment programs (the "TNP Programs" or the "Programs").

39.     On or about March 3, 2008, TNP commenced a private placement offering in a real estate investment fund called Bruin Fund, L.P.

40.     On or about June 3, 2008, TNP commenced a private placement offering of promissory notes in a real estate program called TNP 12% Notes Program, LLC

41.     On or about December 9, 2008 TNP commenced a private placement offering of promissory notes in the TNP 2008 Participating Notes real estate investment program.

42.     In or about December, 2008 TNP commenced a private placement offering in connection with TNP Kodak, the real estate investment program directly at issue in this lawsuit.

43.     On or about August 7, 2009 TNP commenced a public offering of securities in a real estate investment program called TNP Strategic Retail Trust.

44.     TNP conducted offerings for its Programs at the same time.  It encouraged investors to invest in more than one of its Programs.  It raised funds from investors in its Programs for the same purpose: to invest in the real estate market.

45.     TNP managed the Programs concomitantly, from the same offices, and through substantially the same senior management, including Defendant Thompson and the TNP Officer Defendants.

46.     TNP commingled funds from investors in its Programs, as more fully detailed below.

**III.     TNP's Financial Condition Substantially Deteriorates.**

47.     TNP's financial situation began to deteriorate shortly after its formation and continued to worsen over the following months and years.

48.     By April, 2008, TNP had suffered losses of $444,421.  By September, 2008, TNP's losses reached $4,058,000.   Between April and September, 2008, TNP's equity fell from $8,505,897 to $5,393,188, a 36.5% drop in only five months.

49.     By November, 2008 two TNP real estate operations had defaulted on their financial obligations, in an amount that approximated $1,300,000.  The two entities had received formal collection letters from Grubb & Ellis, the entity to whom they owed the past–due amounts.

50.     Between January and September, 2009 TNP incurred operating losses of approximately $16,000,000, resulting in a negative net equity of approximately $6,700,000.  For

1  the year ending December 31, 2009, TNP incurred operating losses of approximately
2  $25,839,000, resulting in a negative net equity of approximately $13,580,000.

3       51.    During 2009 and 2010, TNP and certain of its affiliated entities were experiencing
4  severe cash flow deficiencies and accruing substantial accounts payable, while at the same time
5  lacking sufficient cash or cash equivalents to satisfy creditors in a timely manner.

6       52.    By March, 31, 2012, TNP had negative equity of approximately $45,000,000 and a
7  negative working capital position.

8       **IV.    TNP Commingles Funds Raised from Investors in Its Programs.**

9       53.    Some of the TNP Programs purported to operate as stand-alone investment vehicles
10  and hold real estate investments in their own name, while others were pass-through entities
11  designed to raise funds and transfer them to TNP.  Regardless, TNP commingled funds it raised
12  from investors in all the programs mentioned above.

13      54.    Examples of commingling funds across TNP Programs include:

14           a.    During 2009 and 2010, TNP 12% Notes Program and TNP 2008
15                Participating Notes Program were unable to pay certain investor
16                distributions from operating cash flow and relied on new investor proceeds
17                or transfers of cash from TNP or its affiliates in order to make investor
18                distributions;

19           b.    On four occasions in 2009, funds were transferred from TNP 2008
20                Participating Notes to the Bruin Fund, in an aggregate amount of
21                approximately $186,000.00, which the Bruin Fund invested in two
22                properties;

23           c.    In late 2008 or early 2009 TNP transferred $800,000 from TNP Kodak to its
24                affiliate in an undisclosed transaction which, years later, it portrayed as an
25                overlooked fee; during 2010, TNP transferred over $2,000,000 from TNP
26                Kodak to itself with no apparent economic justification.  Upon information
27                and belief, such funds were commingled with funds from, and/or were
28                transferred to, other TNP Programs;

d.      Between April and June, 2011 TNP transferred nearly $1,000,000 from TNP 2008 Participating Notes to TNP Strategic Retail Trust in a purported loan; and

e.      In or around June, 2011, TNP transferred $775,000 from TNP 2008 Participating Notes to TNP Strategic Retail Trust in a purported loan.

55.     Defendants did not disclose to investors in such TNP Programs that their investments would be commingled and/or used to prop up TNP, TNP affiliates, and/or other TNP Programs.

56.     Because of their positions of control and authority as senior officers, executives, and/or principals of TNP, Defendant Thompson and the TNP Officer Defendants were aware, or in the alternative reasonably should have been aware, of the commingling and misuse of funds of investors in such programs.   TNP knew of such commingling and misuse of funds because (1) such comingling and misuse were conducted by TNP and/or affiliates it controlled and at its direction, and because (2) Defendant Thompson's and the TNP Officer Defendants' knowledge is imputed to TNP by virtue of the roles they played within TNP.

**V.      TNP Engages in Misrepresentations and Omissions in Connection with the TNP Program Offerings.**

57.     Defendants promoted, directed, and/or oversaw the promotion of the TNP Programs through misrepresentations and omissions, including:

a.      Defendants misrepresented the Use of Proceeds to be invested by investors in the Programs, by failing to disclose that such proceeds would be and/or were being commingled, transferred to other TNP Programs, and/or siphoned by TNP;

b.      TNP purported to guarantee the principal of, and distribution payments to, investors in some of the TNP Programs such as TNP 12% Notes and TNP 2008 Participating Notes, but failed to disclose that it was unable to make good on such guarantees because of its insufficient equity and deteriorating

financials.  Instead, it merely mentioned the eventuality that it may become unable to do so in the future;

   c.     Defendants failed to disclose the growing and increasingly debilitating losses and cash flow problems TNP was facing that were threatening its ability to continue to pay its expenses, and to operate and manage the TNP Programs.  Instead, they merely mentioned that TNP had suffered losses, without disclosing their magnitude and its negative net equity.

   d.     Defendants failed to disclose that, in order to meet financial obligations incurred in connection with past offerings, TNP and its affiliates were dependent on continuously raising new capital from investors.

58.    Because of their positions of control and authority as senior officers, executives, and/or principals of TNP and the fact that they prepared, directed, and/or oversaw the preparation of such offering documents, Defendant Thompson and the TNP Officer Defendants were aware, or in the alternative reasonably should have been aware, of the misrepresentations and omissions in the offering documents of the TNP programs.  TNP knew of such misrepresentations and omissions because (1) it prepared and/or oversaw the preparation of such documents and because (2) Defendant Thompson's and the TNP Officer Defendants' knowledge is imputed to TNP by virtue of the roles they played within TNP.

**VI.    Defendants Organize TNP Kodak.**

59.    In or around December, 2008 Defendants organized TNP Kodak.  The principal place of business of TNP Kodak was Irvine, California.

60.    TNP Kodak was organized as a Delaware statutory trust.  It offered beneficial interests to investors seeking to invest in real estate in the form of an IRS Section 1031 Exchange program ("Section 1031 Exchange Program").

61.    A Section 1031 Exchange Program allows real estate investors to defer the tax consequences of a sale of real estate property by replacing such property with another property in a tax-free transaction under the Internal Revenue Code, Section 1031 (26 U.S.C. §1031).

62.     TNP Kodak was to raise $16,570,000 from investors nationwide.  The proceeds were to be used as partial payment for the acquisition of a commercial property to be leased by Kodak in Hollywood, Los Angeles County, California (the "Property").

63.     TNP was to play a key role in conducting the TNP Kodak offering and subsequently managing TNP Kodak and the Property.  According to the TNP Kodak Private Placement Memorandum, TNP, directly and/or through affiliates it wholly owned and/or controlled, was to, *inter alia*:

a.      Organize and oversee the TNP Kodak offering;

b.      Negotiate the purchase of the Property;

c.      Help obtain a loan for TNP Kodak to be used as partial payment for the price for the Property;

d.      Provide financing to TNP Kodak to be used as partial payment for the price for the Property;

e.      Operate and manage the Property;

f.      Monitor the performance of the Property;

g.      Review and evaluate financial aspects of the Property assets;

h.      Oversee real estate tax assessments;

i.      Prepare financial reports for lenders;

j.      Manage accounts and administer distributions to investors;

k.      Collect the rent and other amounts due and make payments for TNP Kodak's expenses;

l.      Oversee TNP Kodak's books and finances; and

m.      Negotiate the sale of the Property and the liquidation of TNP Kodak, if necessary.

**VII.   Defendants Cause Numerous Misrepresentations and Omissions to Be Incorporated in the TNP Kodak Offering Documents.**

64.     In or around December 2008 Defendants prepared and/or oversaw and directed the preparation of, offering documents for TNP Kodak (the "TNP Kodak Offering Documents"),

including a Private Placement Memorandum (the "TNP Kodak PPM") and a Brochure (the "TNP Kodak Brochure").

65.    The TNP Kodak Offering Documents contained several categories of misrepresentations and omissions, as set forth below:

a.    <u>Misrepresentations and Omissions as to TNP</u>

66.    The TNP Kodak Offering Documents made it clear that the success of TNP Kodak would depend upon its management by TNP and upon the skill and expertise of TNP, its principal, Defendant Thompson, and its executive team, the TNP Officer Defendants.

67.    The TNP Kodak Offering Documents emphasized in detail the role TNP and its wholly-owned and controlled affiliates played in organizing TNP Kodak, identifying and acquiring the Property, securing a bank loan and providing additional financing, operating and managing the Property, monitoring the Property's performance, overseeing TNP Kodak's financial affairs, handling financial reporting, distributing profits to investors, and negotiating an "exit strategy" for the TNP Kodak investors.

68.    The TNP Kodak Offering Documents cautioned investors to only invest in TNP Kodak if they were "willing to entrust all such aspects of the assets and finances of the [Kodak] Property" to TNP's wholly-owned affiliates.

69.    The TNP Kodak Offering Documents stated that TNP was a "company that can weather the financial storm" of the troubled 2008 national economy.  They assured investors that "Thompson National Properties is poised to take the marketplace by storm."  They represented to investors that TNP would be able to "efficiently operate and manage [real estate properties] while carefully planning and implementing capital improvements" and that TNP's "thoughtful control" "of the management of both the asset and property management teams" allows it to be "creatively aggressive when negotiating new leases and tenant renewals."

70.    While emphasizing the crucial role TNP was going to play in TNP Kodak's performance, the TNP Kodak Offering Documents were silent about TNP's rapidly deteriorating financial situation.  They did not mention the two November 2008 defaults by TNP real estate operations on approximately $1,300,000 past due and the initiation of collection activities by

1   Grubb & Ellis.  They did not disclose the magnitude of TNP's cash flow problems and its *de facto*

2   insolvency.   The "Risks" section of the TNP Kodak PPM does not disclose that TNP was

3   incurring ever-larger losses.  It does not mention possible risks to TNP Kodak's operations and

4   success arising out of TNP's growing, and already debilitating, financial problems.

5        71.     The TNP Kodak Offering Documents repeatedly emphasized the TNP executive

6   team's, and Defendant Thompson's, "excellent reputation" and "decades of experience" in the

7   real estate industry.

8        72.     However, the TNP Kodak Offering Documents failed to disclose that Defendants

9   were conducting several other offerings through misrepresentations and omissions, as more fully

10   detailed above, and were converting funds invested in such offerings by misusing such funds and

11   commingling them without disclosure to, and permission from, investors, in Ponzi-scheme

12   fashion.

13        b.     <u>Misrepresentations and Omissions as to the Use of Investor Proceeds</u>

14        73.     The TNP Kodak PPM stated that investor money would be used for "acquiring the

15   [Kodak] Property, establishing the [TNP Kodak] Reserve Account and paying all related fees and

16   expenses."

17        74.     The TNP Kodak PPM included an "Estimated Use of Proceeds" sheet that reflected

18   "the present intention of the Sponsor" barring any "unforeseen circumstances" and stated that, of

19   100% of the investors' proceeds, 12.5% would be used for offering-related expenses and

20   commissions and the remaining 87.5% would be used for:

21            i.       purchase of the real estate (77.42%)

22            ii.      acquisition fee (5.69%)

23            iii.     financing and loan closing costs (3.19%) and

24            iv.      legal and due diligence costs (1.20%).

25        75.     However, the TNP Kodak PPM failed to disclose a $800,000 payment, or nearly

26   5% of the value of the offering proceeds, made to a TNP affiliate, TNP Property Manager, LLC,

27   in late 2008 or early 2009.  TNP belatedly disclosed the $800,000 payment, in December, 2011,

28

but in the same disclosure also advised investors that they "will not have the right to have [their] subscription funds returned to [them]."

76.     The TNP Kodak PPM also failed to disclose that investor proceeds would be transferred to TNP without any apparent economic justification, to the tune of over $2,000,000, or more than 12% of the offering proceeds, as of the end of 2010.

c.     Misrepresentations and Omissions as to Kodak

77.     Kodak's continuing success and solvency were crucial to the success of TNP Kodak, as the substantial rent paid by Kodak ($2,272,773.92 per year in the first year of the lease, with increases of 3% per year thereafter) represented almost all of TNP Kodak's revenue.

78.     The TNP Kodak Offering Documents represented to investors that a "Top Reason" to invest in the TNP Kodak's program was the "strength of [the] tenant," Kodak, a "premier multinational corporation."

79.     Despite this, TNP provided little information about Kodak in the TNP Kodak Offering Documents, and the information it did provide was almost entirely (and misleadingly) positive.

80.     The TNP Kodak PPM provided less than one page of information about Kodak.  It described Kodak as "a premier multinational corporation with a brand recognized in virtually every country in the world."

81.     The TNP Kodak Offering Documents failed to disclose, however, that Kodak was a deeply troubled company with an uncertain future that had just emerged from a substantial restructuring during which it had closed many of its facilities and fired tens of thousands of employees.  Kodak, which was built on the photographic film business, was struggling to find an identity in an increasingly digital world.

82.     Between 2004 and 2008, Kodak had reported only a single profitable year.

83.     Kodak's revenues and earnings from continuing operations between 2007-2010 were as follows:

---

Annual figures:

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Net Revenues | $10.3b | $9.4b | $7.6b | $5.9b |
| Operating Income | - 205m | -727m | -232m | -535m |
| Net Cash Flow | 1.4b | -802m | -121m | -400m |

("b" = $billion; "m" = $million)

Quarterly figures (2007-2008):

|  | Q1 2007 | Q2 2007 | Q3 2007 | Q4 2007 | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
|---|---|---|---|---|---|---|---|---|
| Net Revenues | $2b | $2.4b | $2.5b | $3.2b | $2.1b | $2.4b | $2.4b | $2.4b |
| Operating Income | 151m | 575m | 37m | 215m | 115m | 495m | 96m | -918m |
| Net Cash Flow | -443m | 899m | -78m | 1.1b | -744m | 105m | -466m | 303m |

("b" = $billion; "m" = $million)

Quarterly figures (2009-2010):

|  | Q1 2009 | Q2 2009 | Q3 2009 | Q4 2009 | Q1 2010 | Q2 2010 | Q3 2010 | Q4 2010 |
|---|---|---|---|---|---|---|---|---|
| Net Revenues | $1.4b | $1.7b | $1.7b | $2.5b | $1.9b | $1.5b | $1.7b | 768m |
| Operating Income | -353m | -189m | -111m | 443m | 119m | -168m | -43m | -595m |
| Net Cash Flow | -836m | 177m | 15m | 877m | -524m | 187m | 84m | 227m |

("b" = $billion; "m" = $million)

84.     TNP presented the limited financial information about Kodak in the TNP Kodak PPM in such a way as to leave the misleading impression that Kodak's financial situation was improving.  The TNP Kodak PPM reported that Kodak's revenue for 2008 2Q was "$2.49 billion (19% increase from previous quarter)" and for 2008 3Q was "$2.41 billion (-3% decrease from previous quarter)," thus leaving the impression that overall revenues for 2008 were likely to be greater than for 2007 and 2006, which were reported as "$10.30 billion (-3% decrease from previous year" and "$10.57 billion (-7% decrease from previous year)."

85.     In fact, Kodak's 2008 fourth quarter was disastrous.  In that quarter, Kodak's sales totaled $2.433 billion, a 24% decline from the same quarter in 2007.  While this was higher than the previous quarter, it was nonetheless a very concerning result given the heavy seasonality of Kodak's sales (i.e. its reliance on consumer purchases around Christmas).   And despite the apparent strong performance of the second quarter of 2008, Kodak reported only $9.416 billion in revenues for all of 2008, a 9% decline from 2007.

86.     Kodak's stock declined from $16.88 in August 2008 (around when the 2Q figures were released) to $2.24 in March 2009 (the period immediately after the 4Q figures were released).  Defendants did not disclose the impact of this decline on Kodak's continued viability, for example its significantly–constrained ability to raise new capital by issuing equity.

87.     Although the TNP Kodak PPM was in active circulation as of January 2009 and was in fact supplemented in April 2009, TNP did nothing to advise potential investors of Kodak's deteriorating financial condition.

88.     The TNP Kodak Offering Documents also presented misleading and incomplete information about Kodak's Entertainment Imaging business, the business which would be housed at the Property.

89.     Overall, the reportable segment to which Entertainment Imagining belonged was in a state of rapid and inexorable decline.  Kodak's Film, Photofinishing and Entertainment Group's annual revenues and earnings from continuing operations between 2007 and 2010 were as follows:

|                  | 2007  | 2008  | 2009  | 2010  |
|------------------|-------|-------|-------|-------|
| Net Revenues     | $3.6b | $2.9b | $2.2b | $2.4b |
| Operating Income | 369m  | 196m  | 187m  | 14m   |

90.     The TNP Kodak PPM described the Entertainment Imaging business as follows:

Headquartered in Hollywood, California, Eastman Kodak's Entertainment Imagining ("EI") business is the company's motion picture division.   EI's

long term commitment to the market, and its facilities, is best demonstrated by the over $10 million invested in to the infrastructure and equipment at the project in the past several years.  Because the Tenant is the film provider of choice for television, commercial and film content producers, it must retain a location in Hollywood where it can readily serve its clients.  The Tenant has the leading share of origination film market by a significant margin, led by the widely-acclaimed and Oscar-award winning VISION 2 series of motion picture films and the positive reception of the company's recently introduced VISION3 motion picture film.

91.     The TNP Offering Documents failed to disclose, however, that Kodak's Entertainment Imagining group faced an existential threat from the ever-increasing use of digital methods to record and distribute entertainment content.  A similar shift from conventional methods of taking and storing still photographs to digital methods had already caused a substantial decline in Kodak's revenues.

92.     Kodak itself was aware of this danger.  In its 2007 Annual Report, Kodak disclosed that:

Throughout the world, most Entertainment Imaging products are sold directly to studios, laboratories, independent filmmakers or production companies.  Quality and availability are important factors for these products, which are sold in a price competitive environment.  As the industry moves to digital formats, the Company anticipates that it will face new competitors, including some of its current customers and other electronic manufacturers.

93.     The magnitude of the transition is illustrated by the fact that, while in 2006 the number of theater screens that projected movies on celluloid film stock in the United States was 36,412, by 2012 that number had plummeted to 6,426, an 82.35% decrease.[1]

94.     The TNP Kodak PPM did not mention any possible risk to TNP Kodak's success arising from Kodak's deteriorating financial condition in general or the precariousness of its Entertainment Imaging business specifically.  Rather, it contained only "boilerplate" disclosures about the consequences of the tenant's default.

95.     Because of their positions of control and authority as senior officers, executives, and/or principals of TNP and the fact that they prepared, directed, and/or oversaw the preparation of the TNP Kodak Offering Documents, Defendant Thompson and the TNP Officer Defendants were aware, or in the alternative reasonably should have been aware, of such misrepresentations and omissions in such offering documents.  TNP knew of such misrepresentations and omissions because (1) it prepared and/or oversaw the preparation of such documents and because (2) Defendant Thompson's and the TNP Officer Defendants' knowledge is imputed to TNP by virtue of the roles they played within TNP.  Defendants were aware, or in the alternative should have been aware, of the true facts regarding TNP's deteriorating financial condition, serial misappropriation and commingling of investor proceeds, and pattern of conducting their Programs in Ponzi-like fashion because they themselves caused and/or authorized such conduct. Defendants were also aware, or in the alternative reasonably should have been aware, of the true facts regarding their misappropriation of investor proceeds with respect to TNP Kodak because they themselves caused and/or authorized such misappropriation.  Finally, Defendants were aware, or in the alternative reasonably should have been aware, of the misrepresentations and

---

[1] See Motion Picture Association of America, Theatrical Market Statistics Report, 2010, p.15 and p. 16, available at http://www.stop-runaway-production.com/wp-content/uploads/2009/07/2010-MPAA-market-stats.pdf, Motion Picture Association of America, Theatrical Market Statistics Report 2011, p. 6 and p. 18 (March 22, 2012), available at http://www.mpaa.org/resources/5bec4ac9-a95e-443b-987b-bff6fb5455a9.pdf ; Motion Picture Association of America, Theatrical Market Statistics Report, 2012, p. 6 and p. 22 (March 21, 2013), available at http://www.mpaa.org/resources/3037b7a4-58a2-4109-8012-58fca3abdf1b.pdf

1  omissions as to Kodak because they had access to data that evidenced Kodak's deteriorating
2  situation.  Indeed, it is apparent that Defendants copied (in many cases word-for-word) language
3  contained in documents prepared by Kodak that would have also disclosed many of the facts set
4  forth above.  And in subsequent communications to TNP Kodak investors, Defendants repeatedly
5  claimed that they had "always" been keeping close track of Kodak's finances.

6  **VIII.  Defendants Conduct the TNP Kodak Offering Through the Use of the
7          Misleading TNP Kodak Offering Documents.**

8  96.     Prospective TNP Kodak investors, including Plaintiff, were approached by
9  Defendants' agents and received the TNP Kodak Offering Documents from these agents.

10  97.     Defendants oversaw, directed, and controlled the TNP Kodak offering and the
11  manner in which it was conducted.

12  98.     The TNP Kodak Offering Documents distributed to investors included the
13  misrepresentations and omissions set forth above.

14  **IX.   Plaintiff and the Class Members Invest in TNP Kodak in Reliance Upon the
15         TNP Kodak Offering Documents.**

16  99.     TNP Kodak investors were advised in writing, and required to acknowledge in
17  writing, that they based their decision to invest in TNP Kodak on the TNP Kodak PPM and relied
18  "only on the information contained in said [TNP Kodak PPM] and has not relied upon any
19  representations made by any other person."

20  100.    TNP Kodak effected the first sale of TNP Kodak investments on or about April 2,
21  2009, well after Kodak had announced its financial results for the fourth quarter of 2008.

22  101.    Between April 2, 2009 and about June, 2010, approximately 103 investors,
23  including Plaintiff, purchased TNP Kodak securities, in reliance upon the representations in the
24  TNP Kodak Offering Documents.

25  102.    TNP Kodak raised $16,540,000 from investors through the use of the misleading
26  TNP Kodak Offering Documents.

27
28

103.     Plaintiff invested $100,000 in TNP Kodak.  Prior to investing, she received the TNP Kodak Offering Documents from Defendants' agents.  She invested in TNP Kodak in reliance upon the information in such Documents, which she believed to be true and accurate.  She executed the TNP Kodak Purchase Agreement, in which she acknowledged that she was "basing her decision to invest in [TNP Kodak] on the [TNP Kodak PPM] and [she] has relied only on the information contained in such materials and has not relied upon any representations made by any other person."  She had her money delivered to TNP Kodak, care of TNP, and received interests in TNP Kodak in return.

**X.     Kodak Files for Bankruptcy and Rejects the Lease on the Property, and TNP Sells the Property at a Substantial Loss.**

104.     On January 19, 2012, Kodak filed for bankruptcy.

105.     Despite Kodak's bankruptcy filing, TNP continued to make distributions to investors until July 2012 and to assure the investors that it was unlikely that, despite the bankruptcy, Kodak would elect to reject the lease and that TNP was actively seeking to facilitate Kodak's sublease of part of the Property.  In a letter to investors dated April 10, 2012, TNP stated that it "has always tracked the financial condition of Kodak," an admission that Defendants were well aware, or in the alternative reasonably should have been aware, of the risks involving Kodak that they failed to disclose to investors in the TNP Kodak PPM and its supplements.

106.     In May 2012, Kodak vacated one of the two buildings on the Property, although it continued to pay the full rent.

107.     On July 2, 2012, TNP informed the investors in TNP Kodak that it was suspending any further distributions to them in light of TNP's difficulty in finding tenants to sublease the parts of the Property vacated by Kodak on favorable terms.  TNP also informed the investors that it was aggressively pursuing the option of selling the Property.

108.     Having siphoned more than $2,800,000 from TNP Kodak, Defendants left TNP Kodak with insufficient funds to continue to service the mortgage payments and avoid foreclosure while searching for new tenants or evaluating other options, including searching for a buyer willing to pay a price commensurate with the Property's value.

109.   In early 2013, Kodak rejected the lease on the Property and, in February 2013, Kodak vacated that part of the Property that it had not earlier vacated and ceased paying rent.

110.   On April 19, 2013, TNP informed the investors in TNP Kodak that it had reached an agreement to sell the Property to an affiliate of Lincoln Properties, which had also purchased the mortgage on the Property, for $24.7 million, having acquired it for $31.4 million.

111.   The sale was eventually closed in late May, 2013.

112.   TNP Kodak was liquidated, and what cash was left was distributed to its investors. To date, Plaintiff has received only $37,195.54 as a result of the sale, a return of 37.2% on her investment.  The other investors received the same return percentage.

**XI.   Financial Industry Regulatory Action Documents Securities Rule Violations by TNP.**

113.   On or about June 5, 2013, the Financial Industry Regulatory Authority ("FINRA") entered an Order Accepting Offer of Settlement (the "Order") imposing sanctions upon Wendy Worchester, a former Chief Financial Officer of a TNP-sponsored real estate program, TNP Strategic Retail Trust and former Co-Chief Compliance Officer of TNP's in-house broker-dealer firm, TNP Securities.

114.   In its Order, FINRA made the following findings of fact as to TNP:

a.     "During 2009 and 2010, TNP and certain of its affiliated entities were experiencing severe cash flow deficiencies and accruing substantial accounts payable, and the companies lacked sufficient cash or cash equivalents to satisfy creditors in a timely manner."

b.     "During 2009 and 2010, [TNP] 12% Notes and [TNP 2008 Participating Notes] were unable to pay certain investor distributions from operating cash flow and relied on new investor proceeds or transfers of cash from TNP or its affiliates in order to make distributions to investors."

115.   In its Order, FINRA noted that representations made in the offering documents of several TNP – sponsored real estate investment programs were "materially misleading" because, *inter alia*, they "fail[ed] to disclose adequately the true deteriorating financial condition of TNP"

1    and that representations that TNP has suffered losses were "inadequate in that [they] failed to

2    disclose the magnitude of the losses or negative net equity of TNP."

3                    **CLASS ACTION ALLEGATIONS**

4           116.    This action is brought by Plaintiff, for herself and on behalf of all others similarly

5    situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

6                         **Class Definition**

7           117.    The proposed Class (the "Class") is defined as follows:

8    All persons and entities that purchased, subscribed and paid for, or otherwise acquired securities

9    in TNP Kodak pursuant to the TNP Kodak offering organized by Defendants between December,

10   2008 and May, 2010.

11          118.    Excluded from the class are: Defendants, any judge or judicial officer who may

12   hear any aspect of this case (and his or her law clerks), and any person, firm, trust, corporation, or

13   other entity related to or affiliated with any of Defendants.

14                          **Numerosity**

15          119.    The members of the Class are so numerous and geographically dispersed that

16   joinder of all members is impracticable. While the exact number of Class members remains

17   unknown at this time, TNP Kodak reports filed with the Securities and Exchange Commission

18   indicate there are in excess of one hundred members of the proposed class.  The exact number of

19   TNP Kodak investors is within the knowledge of Defendants.

20                         **Commonality**

21          120.    There are common questions of law and fact in this class action that relate to and

22   affect the rights of each member of the Class including, *inter alia*:

23                  a.      Whether Defendants intentionally and/or negligently misrepresented and

24                          omitted risks the associated with the TNP Kodak securities in the TNP

25                          Offering Documents, which were provided to each Class member;

26                  b.      Whether Defendants had a duty to the members of the Class;

27

28

c.   Whether Defendants breached duties owed to Plaintiff and the Class by failing to conform their conduct to the requirements of the law and applicable regulations;

d.   Whether statements or omissions made by Defendants to investors misrepresented material facts about TNP Kodak;

e.   Whether Defendants' misconduct entitles Plaintiffs and members of the Class to rescission and/or damages for the loss of the amounts invested by Plaintiffs and members of the Class;

f.   What remedies are appropriate compensation for the damages caused to Plaintiffs and each member of the Class; and

g.   Whether the Plaintiffs and members of the Class are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

**Typicality**

121.   The claims of Plaintiff are typical of the claims of all Class members.  Plaintiff is situated identically to all members of the Class with respect to the issues presented in this case, as Plaintiff and all members of the Class were investors in TNP Kodak and suffered the exact same loss (in proportion to the amount of their investment).  The claims of Plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

122.   All investors in TNP Kodak have been adversely affected by the wrongdoing of Defendants as described herein.

**Adequacy of Representation**

123.   Plaintiff will adequately represent and protect the interests of the Class and has no interests that conflict with or are antagonistic to the interests of the Class.

124.   Plaintiff has retained attorneys who are experienced and capable of prosecuting complex litigation such as this case. The attorneys for Plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof. The attorneys for Plaintiff have adequate resources, experience and commitment to litigate this matter.

**Predominance and Superiority**

125.    A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and undesirable for each of the individual Class members who have suffered damages to bring separate actions.  Some investors invested amounts in TNP Kodak that would make it impracticable for them to litigate individualized securities fraud cases concerning this matter.  Moreover, the common issues identified above predominate over individual issues, if any, particular to each class member.  Defendants made uniform misrepresentations and were responsible for uniform omissions with respect to each member of the Class and each member of the Class was injured in exact proportion to the amount of their investment in TNP Kodak.

**COUNT ONE: VIOLATIONS OF CALIFORNIA CORPORATIONS CODE § 25401**

126.    Plaintiff repeats and re-alleges each of the allegations set forth above.

127.    The beneficial interests in TNP Kodak issued by Defendant TNP 6700 Santa Monica Boulevard, DST and sold by Defendants are "securities" within the meaning of Section 25019 of California's Corporate Securities Law of 1968.

128.    All of the beneficial interests in TNP Kodak were "offered for sale" in the state of California pursuant to California Corporations Code § 25008 because the offers for such beneficial interests originated in California, specifically from TNP's headquarters in Irvine, California.

129.    Pursuant to California Corporations Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state … by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

130.    California Corporations Code § 25501 provides that any person who violates § 25401 shall be liable to any other person who purchases a security from him.

131.    As set forth above, Defendants offered for sale and sold beneficial interests in TNP Kodak to Plaintiff and the members of the Class through numerous untrue statements of material

facts as well as omissions of material facts in the TNP Offering Documents regarding: (a) TNP's history and financial condition; (b) the use of investment proceeds; and (c) the financial condition of Kodak generally and the prospects for its Entertainment Imaging business specifically as set forth in paragraphs 65-94 of this Complaint.

132.    Such misrepresented and omitted facts are "material" within the meaning of California Corporations Code § 25401 because they are facts a reasonable investor would consider in deciding whether to invest.

133.    The Defendants either knew or in the exercise of reasonable care should have known that the misrepresentations and omissions in the TNP Kodak Offering Documents were misleading.

134.    Because of their positions of control and authority as senior officers, executives, and/or principals of TNP and the fact that they prepared, directed, and/or oversaw the preparation of the TNP Kodak Offering Documents, Defendant Thompson and the TNP Officer Defendants were aware, or in the alternative reasonably should have been aware, of such misrepresentations and omissions in such offering documents.  TNP knew of such misrepresentations and omissions because (1) it prepared and/or oversaw the preparation of such documents and because (2) Defendant Thompson's and the TNP Officer Defendants' knowledge is imputed to TNP by virtue of the roles they played within TNP.  Defendants were aware, or in the alternative reasonably should have been aware, of the true facts regarding TNP's deteriorating financial condition, serial misappropriation and commingling of investor proceeds, and pattern of conducting their Programs in Ponzi-like fashion because they themselves caused and/or authorized such conduct.  Defendants were also aware, or in the alternative reasonably should have been aware, of the true facts regarding their misappropriation of investor proceeds with respect to TNP Kodak because they themselves caused and/or authorized such misappropriation. Finally, Defendants were aware, or in the alternative should have been aware, of the misrepresentations and omissions as to Kodak because they had access to data that evidenced Kodak's deteriorating situation.  Indeed, it is apparent that Defendants copied (in many cases word-for-word) language contained in documents prepared by Kodak that would have also

1    disclosed many of the facts set forth above.  And in subsequent communications to TNP Kodak

2    investors, Defendants repeatedly claimed that they had "always" been keeping close track of

3    Kodak's finances.

4         135.    To the extent that any Defendant is deemed not to be the seller of the beneficial

5    interests in TNP Kodak, each such Defendant is nonetheless liable for the misrepresentations and

6    omissions made in connection with those securities pursuant to California Corporations Code

7    § 25403, because he, she, or it: (a) had knowledge and directly or indirectly controlled and

8    induced the violation of Section 25401; and/or (b) knowingly provided substantial assistance in

9    the violation of Section 25401 for the reasons set forth in the preceding paragraph.

10        136.    Pursuant to California Corporations Code § 25501, Plaintiff and the members of the

11   Class are entitled to rescission of their purchase of beneficial interests in TNP Kodak and

12   recovery of the full amount of consideration paid for such interests as well as interest at the

13   applicable legal rate.  Alternatively, Plaintiff and members of the Class are entitled to damages,

14   measured as the difference between the price at which the beneficial interests in TNP Kodak were

15   purchased and the value of such interests at the time such interests were disposed of.

16   **COUNT TWO: VIOLATIONS OF CALIFORNIA CORPORATIONS CODE § 25400**

17        137.    Plaintiff repeats and re-alleges each of the allegations set forth above.

18        138.    The beneficial interests in TNP Kodak sold by Defendants are "securities" within

19   the meaning of Section 25019 of California's Corporate Securities Law of 1968.

20        139.    All of the beneficial interests in TNP Kodak were "offered for sale" in the state of

21   California pursuant to California Corporations Code § 25008 because the offers for such

22   beneficial interests originated in California, specifically from TNP's headquarters in Irvine

23   California.

24        140.    Pursuant to California Corporations Code § 25400, it is unlawful for a broker-dealer

25   or seller of a security "to make, for the purpose of inducing the purchase or sale of such security

26   by others, any statement which was, at the time and in the light of the circumstances in which it

27   was made, false or misleading with respect to any material fact, or which omitted to state any

28   material fact necessary in order to make the statements made, in the light of the circumstances

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Prock, et al. v. Thompson National Properties, LLC., et al.*

1    under which they were made, not misleading, and which he knew or had reasonable ground to

2    believe was so false or misleading."

3       141.   California Corporations Code § 25500 provides that any person who willfully

4    participates in a violation of § 25400 shall be liable to any other person who purchases a security

5    at a price which was affected by such violation for damages caused by such violation.

6       142.   As set forth above, Defendants made numerous untrue statements of material facts

7    as well as omissions of material facts in the TNP Offering Documents regarding: (a) TNP's

8    history and financial condition; (b) the use of investment proceeds; and (c) the financial condition

9    of Kodak generally and the prospects for its Entertainment Imaging business specifically as set

10   forth in paragraphs 65-94 of this Complaint.

11      143.   Such misleading statements and omissions were made for the very purpose of

12   inducing the purchase of beneficial interests in TNP Kodak, as they were contained in documents

13   distributed to potential investors.

14      144.   Such misrepresented and omitted facts are "material" within the meaning of

15   California Corporations Code § 25400 because they are facts a reasonable investor would

16   consider in deciding whether to invest.

17      145.   The Defendants either knew or had reasonable grounds to believe that the

18   misrepresentations and omissions in the TNP Kodak Offering Documents were misleading.

19      146.   Because of their positions of control and authority as senior officers, executives,

20   and/or principals of TNP and the fact that they prepared, directed, and/or oversaw the preparation

21   of the TNP Kodak Offering Documents, Defendant Thompson and the TNP Officer Defendants

22   were aware, or in the alternative reasonably should have been aware, of such misrepresentations

23   and omissions in such offering documents.  TNP knew of such misrepresentations and omissions

24   because (1) it prepared and/or oversaw the preparation of such documents and because

25   (2) Defendant Thompson's and the TNP Officer Defendants' knowledge is imputed to TNP by

26   virtue of the roles they played within TNP.  Defendants were aware, or in the alternative

27   reasonably should have been aware, of the true facts regarding TNP's deteriorating financial

28   condition, serial misappropriation and commingling of investor proceeds, and pattern of

1  conducting their Programs in Ponzi-like fashion because they themselves caused and/or
2  authorized such conduct. Defendants were also aware, or in the alternative reasonably should
3  have been aware, of the true facts regarding their misappropriation of investor proceeds with
4  respect to TNP Kodak because they themselves caused and/or authorized such misappropriation.
5  Finally, Defendants were aware, or in the alternative should have been aware, of the
6  misrepresentations and omissions as to Kodak because they had access to data that evidenced
7  Kodak's deteriorating situation.  Indeed, it is apparent that Defendants copied (in many cases
8  word-for-word) language contained in documents prepared by Kodak that would have also
9  disclosed many of the facts set forth above.  And in subsequent communications to TNP Kodak
10  investors, Defendants repeatedly claimed that they had "always" been keeping close track of
11  Kodak's finances.

12      147.    Each of the Defendants willfully participated in the above-alleged violation of
13  Section 25400 for the reasons set forth in the immediately preceding paragraph.  Furthermore,
14  Defendants understood that if the true and complete facts regarding the matters alleged in
15  paragraphs 65-94 of this Complaint were known by investors, it was highly unlikely that any
16  investors would have chosen to entrust their funds to Defendants and/or TNP Kodak.

17      148.    The price of the securities purchased by Plaintiff and the members of the Class were
18  affected by Defendants' violations of Section § 25400 and thus, such violations were the
19  proximate cause of Plaintiff and the members of the Class's loss.  If the complete facts regarding
20  the matters alleged in paragraphs 65-94 of the Complaint had been disclosed to investors, the
21  market value of the beneficial interests in TNP Kodak at the time of purchase would have been
22  zero (or at the very least substantially less than Defendants charged for such interests) because no
23  reasonable investor would entrust their funds to Defendants for TNP Kodak, given TNP's
24  deteriorating financial condition, Defendants' penchant for misappropriation, commingling of
25  investor funds, and operating Ponzi-like schemes, Defendants' intent to misappropriate the TNP
26  Kodak investors' funds, and the fact that the continued stream of income from the investment
27  depended on Kodak, a company facing substantial financial distress due to fundamental market
28

changes whose future viability (especially with respect to the business segment leasing the Property) was in doubt.

149.    Pursuant to California Corporations Code § 25500, Plaintiff and the members of the Class are entitled to damages, measured as the difference between the price at which the beneficial interests in TNP Kodak were purchased and the market value such interests would have had at the time of the purchase in the absence of Defendants' violations of Section § 25400.

## COUNT THREE: INDUCING A CONTRACT BY KNOWING MISREPRESENTATIONS (COMMON LAW AND CALIFORNIA CIVIL CODE § 1572)

150.    Plaintiff repeats and re-alleges each of the allegations set forth above.

151.    As set forth above, Defendants made numerous misrepresentations of material fact and omitted to disclose material information necessary to prevent their representations from being misleading in the TNP Offering Documents regarding (a) TNP's history and financial condition; (b) the use of investment proceeds; and (c) the financial condition of Kodak generally and the prospects for its Entertainment Imaging business specifically.

152.    Defendants had knowledge of the falsity and incompleteness of these representations. In the terms used by California Civil Code § 1572, these representations and omissions were actually fraudulent because each of them were: (1) "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true"; (2) "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true"; and/or (3) "[t]he suppression of that which is true, by one having knowledge or belief of the fact."

153.    Because of their positions of control and authority as senior officers, executives, and/or principals of TNP and the fact that they prepared, directed, and/or oversaw the preparation of the TNP Kodak Offering Documents, Defendant Thompson and the TNP Officer Defendants were aware of such misrepresentations and omissions in such offering documents.  TNP knew of such misrepresentations and omissions because (1) it prepared and/or oversaw the preparation of such documents and because (2) Defendant Thompson's and the TNP Officer Defendants'

knowledge is imputed to TNP by virtue of the roles they played within TNP. Defendants were aware of the true facts regarding TNP's deteriorating financial condition, serial misappropriation and commingling of investor proceeds, and pattern of conducting their Programs in Ponzi-like fashion because they themselves caused and/or authorized such conduct. Defendants were also aware of the true facts regarding their misappropriation of investor proceeds with respect to TNP Kodak because they themselves caused and/or authorized such misappropriation. Finally, Defendants were aware of the misrepresentations and omissions as to Kodak because they had access to data that evidenced Kodak's deteriorating situation. Indeed, it is apparent that Defendants copied (in many cases word-for-word) language contained in documents prepared by Kodak that would have also disclosed many of the facts set forth above. And in subsequent communications to TNP Kodak investors, Defendants repeatedly claimed that they had "always" been keeping close track of Kodak's finances.

154. Defendants nonetheless made such representations with the intent to induce reliance on them by Plaintiff and the members of the Class and cause them to invest in TNP Kodak. Indeed, Defendants required TNP Kodak investors to acknowledge in writing that they based their decision to invest in TNP Kodak on the TNP Kodak PPM and relied "only on the information contained in said [TNP Kodak PPM] and has not relied upon any representations made by any other person." Furthermore, Defendants understood that if the true and complete facts regarding the matters alleged in paragraphs 65-94 of this Complaint were known by investors, it was highly unlikely that any investors would have chosen to entrust their funds to Defendants and/or TNP Kodak.

155. Plaintiff and members of the Class justifiably relied on the statements contained in the Offering Documents for TNP Kodak. The very purpose of the Offering Documents was purportedly to advise Plaintiff and the members of the Class of the risks posed by investing in TNP Kodak and to inform them of TNP's background and management ability.

156. Defendants' misrepresentations were the proximate cause of Plaintiff and the members of the Class's loss. If the complete facts regarding the matters alleged in paragraphs 65-94 of this Complaint had been disclosed to investors, the market value of the beneficial interests

in TNP Kodak at the time of purchase would have been zero (or at the very least substantially less than Defendants charged for such interests) because no reasonable investor would entrust their funds to TNP for TNP Kodak, given TNP's deteriorating financial condition, Defendants' penchant for misappropriation, commingling of investor funds, and operating Ponzi-like schemes, Defendants' intent to misappropriate the TNP Kodak investors' funds,  and the fact that the continued stream of income from the investment depended on Kodak, a company facing substantial financial distress due to fundamental market changes whose future viability (especially with respect to the business segment leasing the Property) was in doubt.

157.    Plaintiff and the members of the Class thus suffered damage from Defendants' fraud.

158.    Plaintiff and the members of the Class are therefore entitled to rescind their investments in TNP Kodak or in the alternative to damages.

159.    Plaintiff and the members of the Class are also entitled to punitive damages against the Defendants pursuant to California Civil Code § 3294 because the Defendants have been guilty of oppression, fraud or malice to such an extent that additional damages should be awarded against each of them for the sake of example and punishment.

160.    To the extent any Defendant is not deemed to be a primary wrongdoer with respect to such fraud, each such Defendant is nonetheless liable for aiding and abetting such fraud for knowing and substantial assistance in the fraud for the reasons set forth in paragraph 153.

## COUNT FOUR: NEGLIGENT MISREPRESENTATION

161.    Plaintiff repeats and re-alleges each of the allegations set forth above.

162.    As set forth above, Defendants made numerous misrepresentations of material facts and affirmative representations of material that were so incomplete as to amount to misrepresentations in the TNP Offering Documents regarding (a) TNP's history and financial condition; (b) the use of investment proceeds; and (c) the financial condition of Kodak generally and the prospects for its Entertainment Imaging business specifically.

163.    Defendants had no reasonable ground for believing those representations to be true and complete.  Because of their positions of control and authority as senior officers, executives,

and/or principals of TNP and the fact that they prepared, directed, and/or oversaw the preparation of the TNP Kodak Offering Documents, Defendant Thompson and the TNP Officer Defendants should have been aware, in the exercise of reasonable care, of such misrepresentations and omissions in such offering documents. TNP should have known of such misrepresentations and omissions because (1) it prepared and/or oversaw the preparation of such documents and because (2) Defendant Thompson's and the TNP Officer Defendants' knowledge is imputed to TNP by virtue of the roles they played within TNP. Defendants reasonably should have been aware of the true facts regarding TNP's deteriorating financial condition, serial misappropriation and commingling of investor proceeds, and pattern of conducting their Programs in Ponzi-like fashion because they themselves caused and/or authorized such conduct. Defendants also reasonably should have been aware of the true facts regarding their misappropriation of investor proceeds with respect to TNP Kodak because they themselves caused and/or authorized such misappropriation. Finally, Defendants reasonably should have been aware of the misrepresentations and omissions as to Kodak because they had access to data that evidenced Kodak's deteriorating situation. Indeed, it is apparent that Defendants copied (in many cases word-for-word) language contained in documents prepared by Kodak that would have also disclosed many of the facts set forth above. And in subsequent communications to TNP Kodak investors, Defendants repeatedly claimed that they had "always" been keeping close track of Kodak's finances.

164. Defendants nonetheless made such incomplete representations with the intent to induce reliance on them by Plaintiff and the members of the Class and cause them to invest in TNP Kodak. Indeed, Defendants required TNP Kodak investors to acknowledge in writing that they based their decision to invest in TNP Kodak on the TNP Kodak PPM and relied "only on the information contained in said [TNP Kodak PPM] and has not relied upon any representations made by any other person."

165. Plaintiff and members of the Class justifiably relied on the statements contained in the Offering Documents for TNP Kodak. The very purpose of the Offering Documents was

purportedly to advise Plaintiff and the members of the Class of the risks posed by investing in TNP Kodak and to inform them of TNP's background and management ability.

166.   Defendants' misrepresentations were the proximate cause of Plaintiff and the members of the Class's loss.  If the complete facts regarding these topics had been disclosed to investors, the market value of the beneficial interests in TNP Kodak at the time of purchase would have been zero (or at the very least substantially less than Defendants charged for such interests) because no reasonable investor would entrust their funds to TNP for TNP Kodak, given TNP's deteriorating financial condition, Defendants' penchant for misappropriation, commingling of investor funds, and operating Ponzi-like schemes, Defendants' intent to misappropriate the TNP Kodak investors' funds,  and the fact that the continued stream of income from the investment depended on Kodak, a company facing substantial financial distress due to fundamental market changes whose future viability (especially with respect to the business segment leasing the Property) was in doubt.

167.   Plaintiff and the members of the Class thus suffered damage from Defendants' negligent misrepresentations.

## COUNT FIVE: BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

168.   Plaintiff repeats and re-alleges each of the allegations set forth above.

169.   As the "signatory trustee" of TNP Kodak pursuant to the Delaware Statutory Trusts law, TNP Commercial Services, LLC owed fiduciary duties to the investors in TNP Kodak.

170.   Although the trust agreement purports to relieve the trustees of most of their fiduciary duties, the trustees remain liable for, among other things, willful misconduct and gross negligence.

171.   TNP Commercial Services, LLC caused or allowed TNP to misappropriate investor funds to itself and/or its affiliates as set forth above, including through the undisclosed $800,000 fee paid to TNP Commercial Services, LLC at the inception of the trust and the unjustified distribution of over $2 million in 2010.

1    172.    This misappropriation was willful and/or grossly negligent.

2    173.    The other Defendants aided and abetted TNP Commercial Services, LLC's breaches

3   of fiduciary duty by their knowing participation in those breaches.  Because of their positions of

4   control and authority as senior officers, executives, and/or principals of TNP and the fact that they

5   prepared, directed, and/or oversaw the preparation of the TNP Kodak Offering Documents,

6   Defendant Thompson and the TNP Officer Defendants were aware that TNP Commercial

7   Services, LLC owed a fiduciary duty to investors and that its misappropriation was a breach of

8   that duty.  TNP knew of the existence and breach of the duty because Defendant Thompson's and

9   the TNP Officer Defendants' knowledge is imputed to TNP by virtue of the roles they played

10  within TNP.  Indeed, these Defendants themselves caused and/or authorized and /or benefited

11  from such misappropriation.

12   174.    These breaches of fiduciary duty caused damage to the investors in TNP Kodak

13  because they reduced the amount of funds available for legitimate trust purposes and ultimately

14  reduced the amounts available to the investors when TNP Kodak was liquidated.

15                                  **PRAYER FOR RELIEF**

16          **Wherefore, Plaintiff, on her own behalf and on behalf of the Class, prays for**

17  **judgment as follows:**

18          (a)    Certifying this action as a class action pursuant to Fed. R. Civ. Proc. Rule 23(b)(3);

19          (b)    Certifying Plaintiff as class representative and appointing the under-signed counsel

20          as class counsel;

21          (c)    Awarding rescission and/or rescissory damages against all Defendants, jointly and

22          severally, in favor of Plaintiff and the members of the Class, including interest;

23          (d)    Awarding compensatory damages in favor of Plaintiff and the members of the Class

24          against all Defendants, jointly and severally, in favor of Plaintiff and the members of the

25          Class, including interest;

26          (e)    Awarding punitive damages in favor of Plaintiff and the members of the Class

27          against all Defendants, jointly and severally;

28

1   (f)   Causing Defendants to disgorge and restore to Plaintiff and the members of the

2   Class all amounts that were misappropriated from TNP Kodak by them, including interest;

3   (g)   Awarding Plaintiffs her reasonable attorneys' fees and costs; and

4   (h)   Granting such other and further relief as the Court may deem just and proper.

5   **JURY TRIAL DEMAND**

6   Plaintiff hereby demands a trial by jury for all issues triable thereby.

7

8   Respectfully submitted,

9   Date: June 20, 2013

10   TODD M. SCHNEIDER (SBN 158253)
    JASON H. KIM (SBN 220279)
11   SCHNEIDER WALLACE
    COTTRELL KONECKY LLP
12   180 Montgomery Street, Suite 2000
    San Francisco, California 94104
13   Tel: (415) 421-7100
    Fax: (415) 421-7105
14   tschneider@schneiderwallace.com
    jkim@schneiderwallace.com

15   GARRETT W. WOTKYNS (*pro hac vice* to be
    submitted)
16   SCHNEIDER WALLACE
    COTTRELL KONECKY LLP
17   8501 North Scottsdale Road, Suite 270
    Scottsdale, Arizona 85253
18   Tel: (480) 428-0141
    Fax: (866) 505-8036
19   gwotkyns@schneiderwallace.com

20   JOSEPH C. PEIFFER (*pro hac vice* to be submitted)
    DANIEL J. CARR (*pro hac vice* to be submitted)
21   FISHMAN HAYGOOD PHELPS WALMSLEY
    WILLIS & SWANSON, LLP
22   201 St. Charles Avenue, 46th Floor
23   New Orleans, Louisiana 70170
    Tel: (504) 586-5252
24   Fax: (504) 586-5250
    jpeiffer@fishmanhaygood.com
25   dcarr@fishmanhaygood.com

26   ALAN L. ROSCA (*pro hac vice* to be submitted)
27   FISHMAN HAYGOOD PHELPS WALMSLEY
    WILLIS & SWANSON, LLP
28   526 Superior Avenue, Suite 401

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cleveland, Ohio 44114
Tel: (216) 570-0097
Fax: (504) 586-5250
arosca@fishmanhaygood.com

EXHIBIT A

## FINANCIAL INDUSTRY REGULATORY AUTHORITY

## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| Department of Enforcement,<br><br>                         Complainant,<br><br>   v.<br><br>Wendy Janeen Worcester<br>(CRD No. 5604845)<br>                    Respondent. | DISCIPLINARY PROCEEDING<br>No. 2011025785601<br><br>Hearing Officer – MAD<br><br>**ORDER ACCEPTING OFFER OF<br>SETTLEMENT**<br><br>Date: June 5, 2013 |

## INTRODUCTION

Disciplinary Proceeding No. 2011025785601 was filed on October 25, 2013, by the Department of Enforcement of the Financial Industry Regulatory Authority (FINRA) (Complainant).   Respondent Wendy J. Worcester submitted an Offer of Settlement (Offer) to Complainant, dated May 21, 2013.  Pursuant to FINRA Rule 9270(e), the Complainant and the National Adjudicatory Council (NAC), a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs (ODA) have accepted the uncontested Offer.  Accordingly, this Order now is issued pursuant to FINRA Rule 9270(e)(3).  The findings, conclusions and sanctions set forth in this Order are those stated in the Offer as accepted by the Complainant and approved by the NAC.

Under the terms of the Offer, Respondent has consented, without admitting or denying the allegations of the Complaint, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, to the entry of

findings and violations consistent with the allegations of the Complaint, and to the imposition of the sanctions set forth below, and fully understands that this Order will become part of Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA.

## FINDINGS AND CONCLUSIONS

It has been determined that the Offer be accepted and that findings be made as follows:

### JURISDICTION

From June 6, 2009 to October 27, 2010, Worcester was associated with FINRA member TNP Securities, LLC, where she was registered as a General Securities Principal, Financial and Operations Principal and General Securities Representative.  Worcester also holds professional designations as a Certified Public Accountant and a Chartered Financial Analyst.  Worcester's conduct occurred while she was associated with the Firm.

Although Worcester is no longer registered or associated with a FINRA member, she remains subject to FINRA's jurisdiction for purposes of this proceeding pursuant to Article V, Section 4 of FINRA's By-Laws, because (1) the Complaint was filed within two years after the effective date of termination of Worcester's registration with the Firm, namely, October 27, 2010; and (2) the Complaint charges her with misconduct committed while she was registered or associated with a FINRA member and with failing to timely appear for on-the-record testimony during the two-year period after the date upon which she ceased to be registered or associated with a FINRA member.

2

## **BACKGROUND**

A.      Worcester held key positions at TNP and the Firm

In or about February 2008, Anthony (Tony) W. Thompson formed Thompson National Properties, LLC (TNP), a Delaware limited liability company.  Thompson is the Managing Member of TNP and acted as its Chief Executive Officer from its inception to on or about June 21, 2012.  In or about June 2008, Worcester joined TNP as it Chief Administrative Officer and Secretary.

On or about July 6, 2009, FINRA approved the membership application of TNP Securities, LLC (CRD No.  149178), a wholly owned subsidiary of TNP.  The primary purpose of TNP Securities was to act as a wholesale broker-dealer for offerings of TNP and its affiliated entities.  From its inception to on or about July 21, 2012, Thompson was the Chief Executive Officer of TNP Securities.  From on or about May 6, 2009 until her termination on October 26, 2010, Worcester served as the Firm's Co-Chief Compliance Officer.

B.      TNP offered several offerings to public investors

On or about March 3, 2008, TNP commenced a private placement offering in the Bruin Fund, L.P.  According to TNP offering documents, the purpose of the Bruin Fund, a closed-end special purpose fund, was to invest in real estate and other opportunities via real estate loans, operating companies and real property transactions.  In 2008, the Bruin Fund acquired two properties located in Dallas, Texas, with an aggregate cost of approximately $14,000,000.00.

On or about June 10, 2008, TNP issued a private placement memorandum (PPM) and commenced a private placement offering of promissory notes in connection with the TNP 12% Notes Program, LLC (12% Notes).  According to its PPM, the purpose of the 12% Notes

Program was generally to fund loans to or equity investments in TNP or its affiliates. Interest payments were to be paid to investors quarterly. The 12% Notes PPM stated that payment of interest and repayment of principal will be unconditionally guaranteed by TNP, its parent. Between June 10, 2008 and January 6, 2010, the 12% Notes program raised approximately $21,599,537.24 from public investors.

On or about December 9, 2008, TNP commenced a private placement offering of promissory notes in connection with the TNP 2008 Participating Notes Program, LLC (PNotes), which was offered and sold through the Firm as wholesaler, beginning in July 2009. The PNotes offering featured three series of notes, paying between 10% and 13%, which return was divided between current interest payments due monthly and additional accrued return, due on maturity in 2013, unless extended for up to two years at the discretion of PNotes. According to its PPM, the proceeds of the PNotes offering were generally to be used to fund or invest, directly or indirectly, in real estate and real estate-related debt. Between December 9, 2008 and March 22, 2010, the PNotes offering raised approximately $26,224,903.00 from public investors, of which approximately $12.5 Million was raised between Sept. 30, 2009 and the close.

The PNotes PPM provided that payment of interest and repayment of principal would be guaranteed by TNP, its parent (the Guaranty), and that TNP would pledge all of the membership interests in the issuer to the purchasers of the Notes as collateral for the Guaranty. The PNotes PPM included an unaudited consolidated balance sheet of TNP, dated September 30, 2008, which reflected that TNP had total assets of $21,801,019.00 and total equity of $5,393,188.00.

Following the close of the PNotes offering, in or about October 2010, TNP conducted a proxy solicitation to request approval by noteholders of an increase in allowable investments in TNP and its affiliates, to a maximum of 50% of the offering proceeds, with no more than 10%, or

4

$2,622,490.00, in any single investment.  On or about October 29, 2010, the PNotes investors approved the increase.

In or about August 2009, TNP commenced a registered offering of equity shares in the TNP Strategic Retail Trust, Inc. (SRT REIT), a Maryland corporation formed in September 2008 that functions as a real estate investment trust.  From the inception of SRT REIT to July 1, 2010, Worcester served as Chief Financial Officer (CFO), Treasurer and Secretary of the SRT REIT and as CFO, Treasurer and Secretary of its advisor, TNP Strategic Retail Advisor, LLC.  The Firm has acted as the managing broker-dealer for the offering since its commencement.  In its disclosures regarding the performance of prior offerings, the SRT REIT prospectus identified, among others, the Bruin Fund, L.P. and PNotes.  Between on or about August 27, 2009 and October 26, 2010, the SRT REIT offering raised approximately $21,000,000.00 from public investors.

On or about April 26, 2010, TNP commenced a private placement offering of promissory notes in connection with the TNP Profit Participation Program, LLC (PPP) to be offered and sold through the Firm as managing broker-dealer and wholesaler.  The PPP offering featured three series of notes, paying between 9% and 10%, which return was divided between current interest payments due monthly and additional accrued return, due on maturity in 2015, unless extended for up to two years at the discretion of PPP.  According to its PPM, the proceeds of the PPP offering generally were to be used to invest or fund investments, directly or indirectly, in real estate and real estate-related debt.  Between April 26, 2010 and October 26, 2010, the PPP program raised from public investors approximately $1,761,849.21.

5

The PPP PPM further stated that payment of interest and repayment of principal would be guaranteed by TNP, its parent (the Guaranty), and that TNP would pledge all of the membership interests in the issuer to the purchasers of the Notes as collateral for the Guaranty.

The PPP PPM further stated, in part, that "TNP has suffered losses since its inception," and that "since 2008, TNP has guaranteed the unsecured debt obligations of two other affiliated note programs that have raised almost $50,000,000 and continue to perform at or above expectations: the 12% Notes program and the PNotes program."

C.    TNP's and its affiliates' financial condition deteriorated significantly beginning in 2009

In 2009, the financial condition of TNP declined significantly. During the period beginning January 1, 2009 and ending September 30, 2009, TNP incurred operating losses of approximately $16,000,000, resulting in a negative net equity of approximately $6,700,000.00. For the annual period ending December 31, 2009, TNP incurred operating losses of approximately $25,839,000.00, resulting in a negative net equity of approximately $13,580,000.00.

During 2009 and 2010, TNP and certain of its affiliated entities were experiencing severe cash flow deficiencies and accruing substantial accounts payable, and the companies lacked sufficient cash or cash equivalents to satisfy creditors in a timely manner.

During 2009 and 2010, 12% Notes and PNotes were unable to pay certain investor distributions from operating cash flow and relied on new investor proceeds or transfers of cash from TNP or its affiliates in order to make distributions to investors.

On four occasions in 2009, funds were transferred from PNotes to the Bruin Fund, in an aggregate amount of approximately $186,000.00, which the Bruin Fund invested in the two properties located in Dallas, Texas, referenced above. On or about June 11, 2010, TNP or one or

6

more of its affiliates, including the Bruin Fund, defaulted on the mortgages for both properties held in the Bruin Fund.  On or about August 4, 2010, the lender foreclosed on both properties, resulting in a total loss of approximately $3,950,000.00 to Bruin Fund investors.  On or about October 27, 2010, PNotes assigned to TNP its loss in the Bruin Fund of approximately $186,000.00.

Instances in which TNP or any of its affiliates provided the cash necessary to make periodic distributions to investors in the PNotes or PPP offerings, as described above, constituted an exercise of the guaranty provisions reflected in the PPMs of the PNotes and PPP offerings, as did the assignment to TNP of the $186,000 loan by PNotes to the Bruin Fund.

## FIRST CAUSE OF ACTION
**(Failure to Establish, Maintain and Enforce Written Supervisory Procedures Regarding the Conduct of Adequate Due Diligence Regarding Registered and Private Placement Securities) (NASD Conduct Rule 3010 and FINRA Rule 2010)**

Worcester was the designated principal responsible for conducting due diligence for private placement and registered offerings by TNP Securities.

From about July 9, 2009 through October 26, 2010, and in connection with the offerings alleged above, Worcester, on behalf of the Firm, failed to establish, maintain, and enforce a supervisory system reasonably designed to achieve TNP's compliance with applicable laws, rules and regulations regarding offerings.  In that regard, Worcester failed to ensure that the affiliation between the Firm and TNP did not compromise Worcester's and the Firm's ability to conduct an independent, thorough and reasonable investigation of each offering in a manner that was reasonably designed to ensure, before the Firm marketed the offerings to other firms, that the Firm had a reasonable basis to believe the offerings were suitable for at least some investors and that the Firm and its personnel did not violate the antifraud provisions of the federal securities

7

laws or FINRA rules in connection with the preparation or distribution of offering documents or sales literature.

Worcester failed to establish, maintain, and enforce a system and procedures reasonably designed to resolve conflicts of interest between the Firm, the issuer, and TNP, in the course of conducting the Firm's due diligence of the PNotes, SRT REIT and PPP offerings, in that Worcester did not:

a.   examine and reasonably evaluate historical and current financial statements of the issuer, TNP and its affiliates and to identify and reasonably evaluate negative trends indicated by the financial statements and the requirements for significant capital infusions, increased revenues from operations, or decreased expenses and the reasonable expectations of realizing the same;

b.   inquire about the business of TNP and its affiliates and the extent to which cash needs or other expectations for TNP or its affiliates might affect the business prospects of the issuer;

c.   contact or evaluate objectively the affiliates' and suppliers' experiences dealing with TNP and the issuer, including accounts payable to employees and vendors;

d.   inquire about past securities offerings and the degree of their success, in particular to the extent the offerings provided a guarantee of principal and interest while, at the same time, TNP and its affiliates were dependent on continuously raising new capital to meet those obligations, and with

8

respect to the compliance of affiliates with the terms of prior offerings;
and

e.     inquire about and evaluate inter-affiliate transactions that might affect the
       issuer's business, including any loans, guaranties, or other transactions
       between and among TNP, the issuer, or its affiliates.

Worcester failed to conduct adequate and independent due diligence regarding the
PNotes, SRT REIT and PPP offerings and thus compromised the independence of the Firm, in
that Worcester knew or should have known, that during the relevant offering periods:

a.     the representations in the SRT REIT prospectus and supplements thereto
       regarding the performance of prior programs had become materially
       misleading in that they failed to disclose adequately the performance of the
       Bruin Fund, L.P and 2008 PNotes;

b.     the representations in the PNotes PPM regarding the financial condition of
       TNP had become materially misleading in that they failed to disclose
       adequately the true deteriorating financial condition of TNP and its ability
       to fulfill its obligations regarding guaranty of principal and interest;

c.     the representation in the PPP PPM that prior note offerings were
       performing at or above expectations was materially misleading in that it
       failed to disclose adequately the true financial condition of TNP, the 12%
       Notes program and the PNotes program, including that the prior note
       issuers made investor distributions from sources other than issuer
       operations, and that guaranties in prior offerings were the source of certain
       investor distributions, including the Bruin Fund loan assignment; and

9

d.      the representation in the PPP PPM that TNP has suffered losses since its

inception was inadequate in that it failed to disclose the magnitude of the

losses or negative net equity of TNP, and thus failed to disclose adequately

the true deteriorating financial condition of TNP and its ability to fulfill its

obligations regarding the offering's guaranty of principal and interest.

Notwithstanding the financial condition of TNP and certain of its affiliated entities,

Worcester did not conduct thorough and independent due diligence and thus failed to resolve

conflicts of interest arising from her dual affiliation with the broker-dealer firm and its parent,

which sponsored the offerings.  As a result, the Firm failed to take steps necessary to establish a

reasonable basis to believe that the offerings were suitable for any investor and failed to ensure

that offering documents and other materials related to the offering distributed to potential and

existing investors disclosed all material facts regarding the issuer, TNP, and its affiliates.  The

failure to supervise the ongoing sales of the SRT REIT, PNotes and PPP offerings in a manner

reasonably designed to achieve compliance with laws, rules and regulations applicable to

securities transactions in offerings constitutes a violation of NASD Conduct Rule 3010 and

FINRA Rule 2010 by Worcester.

Based on the foregoing, Worcester violated NASD Conduct Rule 3010 and FINRA Rule

2010.

### SECOND CAUSE OF ACTION
#### (Failure to Appear For An On-The-Record Testimony)
#### (FINRA Rules 8210 and 2010)

On or about June 5, 2012, pursuant to and in accordance with Rule 8210, FINRA

requested that Worcester appear for an on-the-record interview (OTR) on June 12, 2012, at

FINRA's Los Angeles District 2 office, in connection with FINRA's cycle examination and

10

investigation of TNP Securities and offerings issued by its parent, TNP. FINRA's request was sent by regular first class and certified mail to Worcester's residential address, as reflected in the Central Registration Depository.

Worcester knew of the request for testimony on or before June 11, 2012, when she contacted FINRA and advised that she would not appear for testimony as noticed. Worcester based her refusal on the grounds that the date was inconvenient for her and that she would be represented by certain counsel. FINRA contacted the named attorney (Counsel), who provided FINRA with a written statement that Worcester was not a client and he did not represent her. On June 11, 2012, FINRA advised Worcester by telephone and in writing that FINRA would not continue her OTR unless it received a positive statement of representation from Counsel and a date certain on which Worcester would appear for OTR, that absent fulfillment of these conditions, Worcester's obligation to appear for OTR remained in full force and effect and that, by failing to appear, she could face disciplinary action. Worcester did not respond to the June 11th letter and did not appear for her OTR on June 12, 2012.

On June 14, 2012, pursuant to and in accordance with Rule 8210, FINRA requested that Worcester appear for OTR on June 21, 2012, at FINRA's Los Angeles District 2 office. FINRA's request was sent by regular first class and certified mail to Worcester's residential address, as reflected in the Central Registration Depository.

Worcester knew of the second request for testimony on or before June 20, 2012, when she contacted FINRA and requested a continuance of her OTR to June 28, 2012, to which FINRA staff consented. On June 26, 2012, Worcester informed FINRA by email that she would not appear for OTR on June 28th. Worcester based her refusal on the grounds that she had retained Counsel and he was not available on June 28th. FINRA sent Counsel an email requesting that he

11

confirm representation.  Counsel did not respond to FINRA's inquiries.  On June 27, 2012, FINRA notified Worcester by email that she remained obligated to appear for OTR on June 28, 2012, unless Counsel confirmed representation and provided a date certain during the week of July 9, 2012, on which she would appear for OTR.  FINRA did not receive a response to the June 27th email from Worcester or Counsel.  Worcester did not appear for OTR on June 28, 2012. Worcester's failure to appear for OTR delayed and hindered FINRA's investigation.

Following her second failure to appear for OTR, on June 28, 2012, FINRA advised Worcester in writing that FINRA had made a preliminary determination to initiate a disciplinary action alleging that she had failed to provide testimony requested pursuant to FINRA Rule 8210.

Through Counsel, Worcester subsequently agreed to appear for OTR.  On July 16, 2012, FINRA notified Worcester to appear for OTR on July 25, 2012, on which date she appeared.

Based on the foregoing, Worcester violated FINRA Rules 8210 and 2010.

Based on these considerations, the sanctions hereby imposed by the acceptance of the Offer are in the public interest, are sufficiently remedial to deter Respondent from any future misconduct, and represent a proper discharge by FINRA, of its regulatory responsibility under the Securities Exchange Act of 1934.

## SANCTIONS

It is ordered that Respondent be suspended from association with any FINRA member in any capacity for a period of five months and fined $15,000.00.

The fine shall be due and payable either immediately upon reassociation with a member firm following the five-month suspension noted above, or prior to any application or request for relief from any statutory disqualification resulting from this or any other event or proceeding, whichever is earlier.

The sanctions herein shall be effective on a date set by FINRA staff .

SO ORDERED.

> FINRA
>
> Signed on behalf of the
> Director of ODA, by delegated authority
>
>
> *Cynthia A. Kittle*
> Cynthia A. Kittle
> Senior Regional Counsel
> FINRA Department of Enforcement
> 300 S. Grand Avenue, Suite 1600
> Los Angeles, CA 90071
> (213) 613-2616; Fax: (213) 617-1570

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV13- 942 JST (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[_] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[_] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[_] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

---

CV-18 (03/06)       NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY